[No. B016291. Second Dist., Div. Two. Dec. 2, 1986.]

ROBERT EDWARD BELL, Plaintiff and Respondent, v.
STEPHEN W. ROY et al., Defendants and Appellants.

**COUNSEL**

Jones, Hatfield & Penfield and Thomas E. Polakiewicz for Defendant and Appellant.

Robert P. Mandel for Plaintiff and Respondent.

**OPINION**

**GATES, J.**—Defendant, Stephen W. Roy, appeals from the judgment entered in favor of plaintiff, Robert Edward Bell, in the amount of $54,280.[1] He contends: "I. Section 580b of the Code of Civil Procedure prohibits a deficiency judgment after any sale of real property under a deed of trust given to the vendor to secure payment of the balance of the purchase price. II. The protection provided by Code of Civil Procedure section 580b extends to a note given in exchange for the original purchase money note. III. Respondent neither pleaded nor proved a cause of action for fraud on which the judgment might properly be based."

Viewed in support of the trier of fact's decision, as required by the usual rule governing appellate review (*Estate of Beach* (1975) 15 Cal.3d 623, 631 [125 Cal.Rptr. 570, 542 P.2d 994]), the evidence established that in March 1981, Bell and his wife, who were apparently in the process of dissolving their marriage, agreed to sell their home in Canyon Country to appellant Roy and his wife for $200,800.

The parties originally contemplated that as part of their downpayment the Roys would obtain a $25,000 loan from a designated bank to be secured

---

[1]Although this judgment was rendered against both defendants Stephen W. Roy and his wife, Sandra Roy, only Stephen W. Roy has appealed.

by a second trust deed. The original escrow instructions, in fact, had provided: "Seller [Bell], is responsible for obtaining the new secondary financing with which Buyer [Roy] will take over, subject to [*sic*]. The proceeds of the secondary financing to be deposited in escrow to pay for seller's costs as set forth herein with the balance of the proceeds to be released to Robert Edward Bell only." These instructions were subsequently modified, however, and the initial $25,000 payment apparently was made without secondary financing.

As part of their consummated transaction the Bells took back a second deed of trust from the Roys as security for a promissory note in the amount of $86,600. This note, dated April 1, 1981, required another payment of $25,000 to be made approximately six months later, i.e., on October 3, 1981. Thereafter, monthly payments of $610 would be due until the note matured on March 3, 1984.

Whether by reason of their original plan, or because of the rather large remaining payment of the second $25,000, or for some other unexplained reason, this note also provided that "Beneficiary herein agrees to subordinate to New Secondary Financing at any time." In any event, in October the second $25,000 apparently was paid to Bell's wife and the original note and trust deed were cancelled and replaced by new instruments running in favor of Bell alone for the remaining balance of $61,600. Nonetheless, purposefully or not, the provision for subordination was again repeated.

The present lawsuit stems from the actions taken by appellant in 1982. Commencing in February of that year he arranged to borrow $146,700 from a commercial lending institution without informing it of his then secured indebtedness to Bell. Appellant advised this prospective lender that "The purpose of this equity 2nd trust deed is to use a portion towards home improvements on my existing residence, a portion to pay off a few short term debts to some of my creditors, and the other portion will include paying off a few existing personal debts I have which include hand shake agreement terms only and amount to roughly $50,000.00."

Appellant then contacted Bell and offered to make an early payment of $7,320. Bell accepted but, sadly for him, rather than simply requiring this payment to be noted as a reduction of principal, on March 12, 1982, he gave appellant a reconveyance of his trust deed. Appellant executed a replacement note in the amount of $54,280 in early March 1982, but *did not*

*record the deed of trust that secured it until May 3, 1982.*[2] This enabled appellant, in the interim, to encumber the property with a new second trust deed in favor of the commercial lender to secure the $146,700 loan, an indebtedness that required monthly payments of $2,181. Appellant netted approximately $136,000 from this transaction, thereby effectively destroying Bell's security at a fine profit to himself.

Appellant finalized his venture by "selling" the property for $1 on or about June 29, 1982. In the papers governing this "sale," appellant instructed the escrowholder not to obtain beneficiary statements from any lienholders and agreed to hold the escrow harmless from any liability thereby incurred. Quite anticipatably, it appears the "purchaser" made no payments on any of the encumbrances and the property was foreclosed to satisfy the original first and the new second trust deeds.

At trial, and in his trial brief, Bell's counsel called the court's attention to the fact that Code of Civil Procedure section 580b (the antideficiency statute) had not been raised as an affirmative defense but asserted that appellant's original attorney had agreed that if such a claim were to be tendered Bell might counter it by proving that its application here would constitute a fraud. Appellant's new trial counsel, however, denied knowledge of such an agreement and asserted that his client's possible misconduct could not be considered since Bell had failed to plead fraud as a separate cause of action. The court replied: "Before we take on the posture of a law [and] motion concern we are here for trial and I will have to look at what the pleadings are in the complaint and the answer at the time each side rests. So I am making no rules now as to the scope of the trial. I am going to leave that to you gentlemen to deal with."

As neither party requested a statement of decision, the exact ground, or grounds, upon which the court found in Bell's favor are not defined. Although appellant did not testify or make any other effort to explain his remarkable actions, he nonetheless sought to avoid personal liability on Bell's note by reliance upon the antideficiency statute.  ■  However, whether or not appellant was guilty of a formal fraud, he would have been entitled to the protection of this statute only if the instant scenario were one to which it was intended to apply. That is to say, if appellant's dealings with the property varied so greatly from those which arise with the standard purchase money deed of trust that resort to the antideficiency statute would not serve its laudable purpose, then the trial court could properly have found it inapplicable on that basis alone. (*Spangler* v. *Memel* (1972) 7 Cal.3d 603, 611

[2] Oddly this note continued the litany regarding subordination to "secondary financing" even though by then Bell's trust deed already was a third; a fact, of course, of which Bell was unaware.

[102 Cal.Rptr. 807, 498 P.2d 1055]; *Roseleaf Corp.* v. *Chierighino* (1963) 59 Cal.2d 35, 41 [27 Cal.Rptr. 873, 378 P.2d 97].)

In its simplest form, section 580b was designed to preclude the possibility that a seller might reclaim his land and yet require its purchaser to continue vainly paying its erstwhile sales price.

In *Roseleaf* the court held that one of the goals of the antideficiency statute was to discourage overvaluation of security and precarious land promotion schemes. This objective had the further purpose of preventing "the aggravation of the downturn that would result if defaulting purchasers were burdened with large personal liability [when the inadequacy of security resulted from a decline in property value rather than overvaluation]. Section 580b thus serves as a stabilizing factor in land sales." (*Id.,* at p. 42.)

*Roseleaf* involved notes given as part of the purchase price paid for a hotel. The court determined that those notes, which were secured by land other than that occupied by the hotel, were not purchase money notes as contemplated by the statute since they were not secured by the purchased land. Therefore, the seller could properly hold the purchasers personally responsible for the amounts they represented since to "apply section 580b here would mean that the [purchasers] would acquire the hotel at less than the agreed price. . . ." (*Id.,* at p. 43.)

Another basis for section 580b, i.e., that the vendor taking the "trust deed knows the value of his security and assumes the risk that it may become inadequate" (*Brown* v. *Jensen* (1953) 41 Cal.2d 193, 197 [259 P.2d 425]), was inapplicable in *Roseleaf* as there both parties had equal knowledge concerning the value of the hotel.

In *Spangler* v. *Memel, supra,* 7 Cal.3d 603, a sufficient variation from the standard purchase money deed of trust was found where the vendor agreed to subordinate his security interest to new construction financing. The court reasoned that since "the purchaser does not intend to continue with the same use of the property but actually intends a different use which contemplates considerable improvement of it. . . . the present security value of the property, therefore, is *not* a reliable indicator of the ultimate value of the property; that value will be determined by the success of the venture which contemplates a *change* in the use of the property." (Italics in original.) (*Id.,* at p. 611.)

A further exception to the antideficiency statute has been found where the trustor "tortiously injures the mortgagee's security interest." (*Glendale*

*Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 139 [135 Cal.Rptr. 802].)

The evidence in the instant case clearly demonstrates that appellant, by means of a large surreptitiously obtained loan, in essence had "cashed out" Bell's equity in the property to his own considerable profit without ever having paid the agreed purchase price. In *Syrek* v. *Gould* (1966) 244 Cal.App.2d 149, 153 [52 Cal.Rptr. 827], we refused to permit a pragmatically similar effort to succeed.

It is true that here Bell's notes indicated he had consented to subordinate to secondary financing. However, such consent obviously contemplated his receiving appropriate notice of any such proposed change. In truth, as previously pointed out, it originally had been contemplated that Bell would be "responsible for obtaining the new secondary financing." Further, since reasonableness is an implied term of every agreement, it would necessarily be understood that any new financing would not be such as to render Bell's security valueless.

Appellant's secret misrepresentations to the commercial lender, as well as to Bell, achieved exactly this improper result by subjecting Bell's security to such additional uncontemplated and unforeseen jeopardy that thereafter appellant was willing to part with the property for only $1. (See *Budget Realty, Inc.* v. *Hunter* (1984) 157 Cal.App.3d 511, 516, 517 [204 Cal.Rptr. 48].) This conduct alone provided a sufficient basis for the trial court's rejection of appellant's claimed right to protection under the antideficiency statute. (*Glendale Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co., supra,* 66 Cal.App.3d at p. 139.)

Equally meritless is appellant's contention that Bell's failure to plead a separate cause of action for fraud precluded his preventing appellant from utilizing the antideficiency statute as a sword rather than a shield. First, as we have noted, even if appellant's conduct was not literally fraudulent, the purposes of the antideficiency statute would not have been served by applying it here. Second, if appellant's surreptitious refinancing of the property did constitute a fraud, he could not escape the consequences of his action through procedural nuances.

". . . 'While orderly procedure demands a reasonable enforcement of the rules of pleading, the basic principle of the code system in this state is that the administration of justice shall not be embarrassed by technicalities, strict rules of construction, or useless forms.'" (*Lever* v. *Garoogian* (1974) 41 Cal.App.3d 37, 41 [115 Cal.Rptr. 856], quoting *Buxbom* v. *Smith* (1944) 23 Cal.2d 535, 542 [145 P.2d 305].)

The judgment is affirmed.

Roth, P. J., and Beach, J., concurred.